CLERK'S OFFICE U.S. DIST COURT
AT CHARLOTTESVILLE, VA
FILED

MAR 23 2006

JOHN F. CORCORAN, CLERK
BY: /s/
     DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| ROY M. TERRY, JR., et al.,<br><br>*Plaintiffs,*<br><br>v.<br><br>THOMAS R. WALKER, et al.,<br><br>*Defendant.* | CIVIL ACTION NO. 3:04CV00064<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

Before the Court is the Receiver's Motion for Partial Summary Judgment on Choice of Law for Fraudulent Conveyances, filed on January 13, 2006. In this Motion, the Receiver moves the Court to establish that the law of Michigan shall govern his fraudulent conveyance claim. The Defendants, Thomas R. Walker, Christine M. Walker, and Automix, Inc. ("Automix"), filed a response in opposition on January 27, 2006, arguing that the law of Virginia should govern this claim. The Receiver replied on February 7, 2006. The Court held a hearing on the matter via telephone conference on March 10, 2006. The matter, therefore, is ripe for the Court's review. For the reasons herein stated, Court will grant the Receiver's motion and holds that the law of Michigan shall govern his claim of fraudulent conveyance.

I. Procedural Background

The Receiver brought this action under Section 22(a) of the Securities Act of 1933, 15

1

U.S.C. § 77v(a) and Section 2 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa. The Receiver is acting pursuant to the designation of the Court and under the aegis of the overarching civil action *Securities and Exchange Commission v. Terry L. Dowdell*, Case No. 3:01CV00116, to recover funds illegally disbursed by Terry L. Dowdell while operating a Ponzi scheme in violation of the Acts. Sections 77v(a) and 78aa vest in the federal courts exclusive jurisdiction over all suits in law and equity brought to enforce any liability or duty created by the Acts. This Court, therefore, has a special brand of pendant jurisdiction over the claims, exclusively based in state law, set forth in the Receiver's complaint. Chief among these is the Receiver's claim that the Defendants received fraudulent conveyances from Dowdell's Ponzi scheme.

## II. Factual Background

The factual background surrounding the Ponzi scheme operated by Dowdell is familiar to the Court. Beginning in April 1998 and continuing through 2001, Dowdell operated a classic Ponzi scheme through a Bahamian-based corporation known as the Vavasseur Corporation ("Vavasseur"). Dowdell marketed Vavasseur to investors as a business entity involved in trading medium-term debentures and other private bank debt. To perpetuate his scheme, Dowdell would simply use the money contributed by the newest investors to pay earlier investors their promised "profits." He would then misappropriate the remaining funds, transferring at least $29 million to business associates, family, and friends. In January 2001, the Securities and Exchange Commission ("SEC"), later joined by the Federal Bureau of Investigation, initiated an investigation into the Vavasseur program. The investigation to date has identified at least seventy-six direct investors, with an undetermined number of subinvestors, who contributed to the fraudulent investment program. While the exact amount of investors' loss is as yet unknown,

it is estimated to exceed $121 million.

To facilitate recovery of these losses, Judge Michael appointed Roy M. Terry, Jr. and the law firm of DuretteBradshaw PLC as Receiver for Terry L. Dowdell and his various business entities. The Receiver filed this action against the Defendants on August 2, 2004, asserting claims of unjust enrichment and fraudulent conveyance. The Receiver claims that the Defendants were Vavasseur investors, but that unlike many such investors, the amount of their investments was repaid in full. In addition to the recovery of investment principal, the Receiver asserts that the Defendants received substantial "earnings" on their Vavasseur investment for which they did not give adequate consideration.

The facts relevant to the choice of law issue are largely not in dispute. From April 1998 through March 2000, Dowdell operated Vavasseur out of Florida, where he lived. In March 2000, Dowdell moved his residence and place of business to Charlottesville, Virginia, where he continued to operate Vavasseur. From April 1998 through March 2001, investor funds were initially deposited into accounts under Dowdell's control at Amsouth Bank in Largo, Florida. Dowdell retained direct control over Vavasseur until March, 2001, when, in an attempt to stop an investigation by the United States Securities and Exchange Commission ("SEC"), he purportedly transferred his interest in Vavasseur to a third party and told the SEC that he had repaid all U.S.-based investors. Despite these representations, Dowdell continued to operate Vavasseur through his associates in the United Kingdom, Shindar Gangar and Alan White. Also, Dowdell stopped using the Amsouth Bank accounts at this point, although he continued accepting investor funds at foreign banks and U.S. accounts under his control at Chase Manhattan Bank in New York and Bank of America in Virginia.

3

After November 2001, Vavasseur investors were directed to wire their investments to accounts in Guernsey, the Commonwealth of Dominica, Israel, and Ireland. From this point on, all distributions made to Vavasseur investors were made from foreign bank accounts.

On November 19, 2001, the SEC filed a civil enforcement suit against Dowdell and moved to freeze the foreign bank accounts identified from Vavasseur's financial records. This freeze created severe cash flow problems for Vavasseur, leading it to promise investors in April 2002 that a reorganization would occur and cause yields to increase to over 100% per annum. This reorganization never occurred and the Vavasseur Ponzi scheme soon collapsed.

The Walkers, residents of Michigan, invested in the Vavasseur Ponzi scheme through Automix, a Bahamian-based investment company set up for them on March 2, 2001 by the Bahamian law firm Lennox Paton. The Defendants registered Automix to do business in Michigan as a foreign corporation. They also set up a bank account for Automix at Standard Federal Bank in Michigan. The Defendants invested $100,000 in Vavasseur on April 10, 2001, sending the money from Automix's bank account to Vavasseur's account in Israel. From May 19, 2001 through April 9, 2002, the Defendants received Vavasseur profit distributions from various international banks. All of these profit distributions were sent by wire transfer to Automix's bank account at Standard Federal Bank in Michigan. On March 21, 2002, the Defendants' $100,000 principal was returned to them.

### III. Discussion

*A. Whether to Apply Federal or State Choice of Law Rules*

A United States District Court's choice of law inquiry traditionally occurs as a two step process. First, the court must determine whether federal or state choice of law rules govern.

4

Second, once the court has determined which choice of law rules apply, it must apply these rules to the facts of the case to determine the appropriate substantive laws. The parties are in disagreement at each step.

A federal court exercising diversity or pendent jurisdiction over state law claims must apply the choice of law rules of the forum in determining which law governs those claims. *Klaxon Company v. Stentor Electric Manufacturing, Co., Inc.*, 313 U.S. 487 (1941); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *In re Merritt Dredging Co.*, 839 F.2d 203, 206 (4th Cir. 1988); and *System Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1136 (3d Cir. 1977). This rule is based on the recognition that the commands of *Erie v. Tompkins* extend to the field of conflict of laws because federal choice of law rules are themselves a species of federal common law. *See Klaxon*, 313 U.S. at 496 ("It is not for federal courts to thwart [state] policies by enforcing an independent 'general law' of conflict of laws."); and *In re Gaston & Snow*, 243 F.3d 599, 601-602 (2nd Cir. 2001) ("[F]ederal choice of law rules are a type of federal common law."). Despite this general prohibition on applying federal choice of law rules to state law claims, the Fourth Circuit has indicated that the presence of a "compelling federal interest which dictates otherwise" may justify departure from the rule established in *Klaxon. See In re Merritt Dredging Co.*, 839 F.2d 203, 206 (4th Cir. 1988) (holding that "in the absence of a compelling federal interest which dictates otherwise, the *Klaxon* rule should prevail where a federal bankruptcy court seeks to determine the extent of a debtor's property interest."). At issue, therefore, is whether there exists a compelling federal interest in this case sufficient to justify application of federal choice of law rules.

The Receiver contends that there is no such federal interest in this case. First, he points

out that this case is not in federal court as a matter of federal question jurisdiction, but rather as a result of the Court's jurisdiction over proceedings ancillary to the main SEC enforcement action against Dowdell. The Receiver goes on to note that the claims pled are exclusively state law causes of action, thereby requiring the application of Virginia's choice of law rules. Second, the Receiver argues that his role as a receiver over Vavasseur does not implicate federal interests. Despite being appointed receiver by a federal court pursuant to federal securities laws, the Receiver is not charged with enforcement of federal securities laws. Rather, he contends that his function as Receiver is to vindicate the rights of the Vavasseur corporation.

The Defendants disagree and argue that this case presents a compelling federal interest in using federal choice of law rules. This case, they contend, implicates federal interests because of the important federal securities laws operating in the background. Such laws give the Receiver considerable powers to bring suit and without them the Receiver could not have brought this present action. The Defendant also relies on *SEC v. Infinity Group*, 27 F. Supp. 2d 559 (E.D.Pa. 1998), for the proposition that federal choice of law rules should apply to SEC receivership actions. Like the instant case, *Infinity Group* involved state fraudulent conveyance claims brought by a receiver in a proceeding ancillary to an SEC enforcement action. In deciding whether state or federal choice of law rules applied to the fraudulent conveyance claims, the court there concluded that federal choice of law rules applied because the court was sitting pursuant to federal question jurisdiction. *Infinity Group*, 27 F. Supp. 2d at 564. The Defendants find this to be persuasive authority and point out that the Receiver has relied on its holding in previous proceedings. Finally, the Defendants argue that applying a federal choice of law rule is in the federal interest because it would lead to a uniform body of law applying to the entire

collection of Vavasseur cases, thereby promoting judicial efficiency and conservation of resources.

In deciding this issue, the Court finds that this case does not present a federal interest sufficiently compelling to justify departure from the rule in *Klaxon* and *In re Merritt Dredging*. Although the use of federal choice of law rules throughout the Receiver's cases would tend to promote uniformity and predictability in the selection of substantive law and thereby protect receivership funds from added litigation expenses, these interests are neither federal in nature nor sufficiently compelling. First, the Supreme Court dealt with the interest in uniformity in *O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994), and *Atherton v. FDIC*, 519 U.S. 213 (1997), and found that it could not justify the replacement of a state rule with a federal rule. Although these cases evaluated the uniformity interest in the context of applying federal *substantive* common law rather than federal choice of law rules, this distinction is of no import. For one, the holdings *O'Melveny* and *Atherton* were ultimately grounded in the requirements of *Erie v. Tompkins*, which the Supreme Court extended specifically to the realm of choice of law in *Klaxon*, 313 U.S. at 496. This holding is a recognition that federal choice of law rules are themselves a species of federal common law. *See In re Gaston & Snow*, 243 F.3d at 601-602, and *A.I. Trade Fin. v. Petra Int'l Banking Corp.*, 314 U.S. App. D.C. 122 (D.C. Cir. 1995). This convinces the Court that when the interest of uniformity is insufficient to justify application of federal substantive common law it should also be insufficient for applying federal choice of law rules. Also, while application of federal choice of law rules might reduce litigation expenses and facilitate the Receiver's multijurisdictional litigation efforts, this interest is not federal in character. The Receiver, despite being appointed by a federal court and exercising powers

defined by federal law, is pursuing the private interests of Vavasseur and its defrauded investors rather than the interests of the federal government as a regulator of the U.S. securities market. *See, e.g., O'Melveny*, 512 U.S. at 85; *Atherton*, 519 U.S. at 225; and *Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995).

Finally, the Court is convinced that the Fourth Circuit would find the field of securities regulation analogous to bankruptcy for the purposes of applying federal choice of law rules. Both fields involve federal statutory schemes which often incorporate matters or claims originating in state law. *See, e.g., In re Merritt Dredging Co.*, 839 F.2d 203; and *SEC v. Antar*, 120 F. Supp. 2d 431 (D.N.J. 2000). With respect to the bankruptcy context, the Fourth Circuit in *In re Merritt Dredging Co.* determined that these matters should be governed by state choice of law rules. This holding clearly indicates that the fact that a federal statutory scheme operates in the background of a case will not justify the application of federal choice of law rules to matters which are creatures of state law. That being the case, the *Klaxon* rule should apply to the Receiver's claims. They originate exclusively in state law and arise in a case which is ancillary to the principal SEC enforcement action and in which there are no issues of federal law. The state law claims here, in other words, bear the same relationship to federal law as the property questions in *In re Merritt Dredging Co.* did and should be treated the same.

Thus, the Court finds that federal choice of law rules are inapplicable to the Receiver's claims and that Virginia's choice of law principles will govern them.

B. *Application of Virginia's Choice of Law Rules*

The first step in applying Virginia's choice of law rules is to determine how Virginia would characterize the claim of fraudulent conveyance for choice of law purposes. *See* 16 AM.

JUR. 2D *Conflicts of Law* § 3, at 12 (1998). How Virginia would classify a fraudulent conveyance is a matter of first impression. The Receiver contends, and the Defendants appear to agree, that it should be treated as a claim sounding in tort.

Classification of fraudulent conveyance is not a completely straightforward matter. On the one hand, a claim of fraudulent conveyance resembles an action in tort in that the ultimate issue is not whether the conveyance from grantor to grantee was formally valid as a matter of property law, but rather whether it was done for the purposes of defrauding one's creditors. Many courts and a number of leading commentators have agreed with this approach and have classified these claims as sounding in tort. See, e.g., *RCA Corp. v. Tucker*, 696 F. Supp. 845, 853 (D.N.Y. 1988); *Midlantic Bank, N.A. v. Strong*, 1996 U.S. Dist. LEXIS 22384, * 21-22 (E.D.N.Y. 1996); *Kaliner v. Load Rite Trailers (In re Sverica Acquisition Corp.)*, 179 B.R. 457, 469-470 (Bankr. E.D. Pa., 1995); Leflar, AMERICAN CONFLICTS LAW § 185 at 380 n.6 (3d ed. 1977) (approving "tort characterization" in determining "law governing validity of allegedly fraudulent or preferential transfers and assignments"). On the other hand, a number of courts have rejected this tort characterization, holding that fraudulent conveyance claims sound in equity because they seek the equitable remedy of voiding a conveyance rather than damages. See, e.g., *In re Kaiser Steel Corp.*, 87 B.R. 154, 159 (Bankr. D. Colo. 1988); *United States v. Franklin Nat'l Bank*, 376 F. Supp. 378, 383 (D.N.Y. 1973); and *Federal Deposit Ins. Corp. v. Martinez Almodovar*, 671 F. Supp. 851, 871 (D.P.R. 1987). The Court, however, finds that a claim of fraudulent conveyance under Virginia law falls into the sphere of torts. Fraudulent conveyance goes beyond questions of property law since such a conveyance is "valid between the parties, and in fact as to the whole world, except those within the protection of the statutes." *Catron v. Bostic*,

9

123 Va. 355, 371 (1918) (quoting 3 Am. St. Rep. 717, 727-745). Such a conveyance, in fact, is valid even as to creditors until they seek protection provided by law. *Id.* The purpose of a fraudulent conveyance claim is not to determine whether the transfer was void *ab initio*, but rather it is to determine whether the debtor's actions amounted to a fraud on a creditor, allowing him to recover property notwithstanding its transfer. *See id.* This focus on the improper and fraudulent character of the debtor's conduct and the injury caused to his creditors places these claims most appropriately in tort law. These claims will therefore be treated as sounding in tort for choice of law purposes.

It is well established under Virginia law that actions sounding in tort are governed by the law of the place of the wrong, a principle known otherwise as *lex loci delicti*. *McMillan v. McMillan*, 219 Va. 1127, 1128 (1979); and *Maryland use of Joynes v. Coard*, 175 Va. 571 (1940). It is also established that the place of the wrong for choice of law purposes is the place where "the last event necessary to make an [actor] liable for an alleged tort takes place." *Quillen v. International Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986) (quoting *Miller v. Holiday Inns, Inc.*, 436 F. Supp. 460, 462 (E.D. Va. 1977)). No Virginia court has determined where the last act necessary to complete a fraudulent conveyance takes place.

The major point of the Receiver's argument is that the last act necessary to complete the tort of fraudulent conveyance is the irrevocable delivery of funds or their acceptance by the transferee, not the transferor's order to pay out investor funds. Without a transferee to accept a transfer of funds, in other words, there can be no conveyance and therefore no liability created. The Receiver argues that under the Uniform Commercial Code, the last act necessary to complete a wire transfer occurs where the receiving bank accepts the payment. In this case, this acceptance

10

occurred at Automix's Michigan bank, leading the Receiver to conclude that Michigan law applies.

In contrast to the Receiver's focus on the transfers themselves, the Defendants place the emphasis on Dowdell's actions in transferring investor funds. This, they contend, would lead to the application of Virginia law due to Dowdell's orchestration of these fraudulent transfers from Virginia. Alternatively, the Defendants argue for a "common sense" exception to Virginia's law of *lex loci delicti*. For this proposition, they cite *Farwell v. Un*, 902 F.2d 282 (4th Cir. 1990). In that case, the plaintiff brought a wrongful death suit against two doctors who had treated her decedent husband, alleging that they proximately caused him to commit suicide by failing to involuntarily commit him. The decedent committed suicide in Pennsylvania, although he was treated by the two doctors in Maryland and Delaware. Despite the fact that the decedent's suicide was technically the last act needed to establish a wrongful death cause of action, the Fourth Circuit determined that Pennsylvania law did not apply because Maryland recognized a "common sense" exception to its rule of *lex loci delicti*. The court based this decision on the fact that the doctors were operating under standards of care defined by their respective states and that Maryland's wrongful death statute made the locus of the wrongful act, rather than the locus of death, the critical choice of law factor. The Defendants invoke this common sense exception here, claiming that Virginia law should apply because the wrongful conduct occurred in Virginia, despite the fact that the Michigan bank's receipt of money could formally be viewed as the last act.

Virginia law is unclear as to when a fraudulent conveyance is complete. However, the Court finds that the answer must be found not by applying Virginia's law of fraudulent

11

conveyance, but rather by applying the law determining completion of the transaction in question. This approach is appropriate because looking to Virginia's substantive law of fraudulent conveyance in order to determine which state's law of fraudulent conveyance applies would put the cart before the horse. Moreover, looking to the place where the transaction between Dowdell and the Defendant was completed comports with Virginia's focus on the "last act" necessary to create a tort. A fraudulent conveyance can hardly occur unless the conveyance has come to completion. Focusing on Dowdell's location, on the other hand, would not comport with the rule of *lex loci delicti* because it looks to the initiation, or first act of the fraudulent conveyance, rather than to the last act in its completion.

Also, the Court does not agree with the Defendants' argument that a "common sense" exception is applicable here such that Virginia law would apply. The exception to *lex loci delicti* invoked by the court in *Farwell* was based on the fact that the defendants' liability depended upon the application of a standard of care articulated in the law of their place of conduct. *Farwell*, 902 F2.d 286-287. Under such circumstances, the court found that Maryland would recognize an exception to the rule of *lex loci delicti* and apply the law of the states that provided the standard of care under which the doctors practiced. *Id.* at 287. The Defendants here do not explain how this reasoning applies to the case at bar, other than to argue that because Dowdell committed wrongful acts in Florida it would defy common sense to apply the fraudulent conveyance law of the state where the conveyance was completed. Nor do they allege that they operated under a standard of care defined by Virginia law, requiring the law of that jurisdiction to govern the claim of fraudulent conveyance. Thus, their citation to *Farwell* is simply inapposite.

The conveyances alleged to be fraudulent were completed by wire transfer. The issue,

12

therefore, becomes where transactions in these forms are deemed completed under Virginia law. Under VA. CODE ANN. § 8.4A-104(a), a funds transfer is "completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order." The Court finds that this provision clearly establishes that the last act in a wire transfer of funds occurs at the receiving bank, where the transaction is deemed completed. In this case, the wire transfers were completed upon acceptance of funds by Automix's bank in Michigan. Therefore, Michigan law of fraudulent conveyance will apply to the Defendants' receipt of Vavasseur profit distributions.

## IV. Conclusion

In conclusion, for the reasons herein stated, the Court will grant the Receiver's Motion for Partial Summary Judgment and holds that the Defendant's receipt of Vavasseur profit distributions sent directly by wire transfer to Automix's bank account in Michigan will be governed by Michigan's law of fraudulent conveyance.

An appropriate order this day shall issue.

ENTERED: *[signature]*
United States District Judge

3-23-06
Date